# In the United States Court of Appeals
# For the Eighth Circuit

UNITED STATES OF AMERICA,

APPELLEE,

*V.*

WAKINYAN WAKAN MCARTHUR,

APPELLANT.

*APPEAL FROM THE*
*UNITED STATES DISTRICT COURT FOR THE*
*DISTRICT OF MINNESOTA*

**BRIEF OF APPELLEE**

GREGORY M. BROOKER
*Acting United States Attorney*

ANDREW R. WINTER
*Assistant U.S. Attorney*
*U.S. Attorney's Office*
*District of Minnesota*
*300 South Fourth Street*
*Minneapolis, MN 55415*
*(612) 664-5600*

ATTORNEYS FOR APPELLEE

# SUMMARY OF THE CASE

Wakinyan McArthur was convicted by a jury in the District of Minnesota of conspiracy to participate in racketeering activity, conspiracy to use and carry firearms during and in relation to a crime of violence, conspiracy to distribute and possess with intent to distribute controlled substances, distribution of a controlled substance, and use and carrying of a firearm during and in relation to a crime of violence.

Appellant contends the District Court committed error at sentencing by finding him responsible for between 1,000 and 3,000 kilograms of marijuana, by finding that he maintained a stash house, and by finding that he committed the offenses as part of a pattern of criminal conduct engaged in as a livelihood.

The issues are adequately addressed in the parties' briefs, and no oral argument is necessary.

i

# TABLE OF CONTENTS

SUMMARY OF THE CASE ........................................................ i

TABLE OF AUTHORITIES ..................................................... iii

STATEMENT OF THE ISSUES .................................................. 1

STATEMENT OF THE CASE .................................................... 2

Factual Background. ............................................................ 2

Procedural Background. ..................................................... 24

SUMMARY OF THE ARGUMENT ........................................ 32

ARGUMENT .......................................................................... 34

I.    The District Court Did Not Clearly Err In Its Sentencing
      Determinations. ......................................................... 34

II.   The District Court Did Not Clearly Err In Finding That McArthur
      Maintained A Premises For Manufacturing And Distribution Of
      A Controlled Substance. ............................................ 41

III.  The District Court Did Not Clearly Err In Finding That McArthur
      Committed The Offenses As Part Of A Pattern Of Criminal
      Conduct. .................................................................... 45

IV.   Unless The District Court Cumulatively Erred By More Than Six
      Offense Levels, Any Error Is Harmless. ...................... 49

CONCLUSION ....................................................................... 51

CERTIFICATE OF COMPLIANCE ........................................ 52

Appellate Case: 17-2300     Page: 3     Date Filed: 09/29/2017 Entry ID: 4584463

# <u>TABLE OF AUTHORITIES</u>

Cases

*Ramey v. United States*, 8 F.3d 1313 (8th Cir. 1993) ................................ 40

*United States v. Allen*, 440 F.3d 449 (8th Cir. 2006).................................. 35

*United States v. Ault*, 446 F.3d 821 (8th Cir. 2006) ................................... 36

*United States v. Bradley*, 643 F.3d 1121 (8th Cir. 2011) ........................... 35

*United States v. Darden*, 70 F. 3d 1507 (8th Cir. 1995) ..................... 35, 36

*United States v. Hawkins*, 866 F.3d 344 (5th Cir. 2017) ........................... 48

*United States v. Mannings*, 850 F.3d 404 (8th Cir. 2017)......................... 34

*United States v. Martinez*, 821 F.3d 984 (8th Cir. 2016) .......................... 50

*United States v. Mashek*, 406 F.3d 1012 (8th Cir. 2005) ........................... 50

*United States v. McArthur*, 836 F.3d 931 (8th Cir. 2016) ................. 27, 29

*United States v. Miller*, 698 F.3d 699 (8th Cir. 2012) ............................... 43

*United States v. Morris*, 791 F.3d 910 (8th Cir. 2015) ............................. 48

*United States v. Payton*, 636 F.3d 1027 (8th Cir. 2011)..................... 35, 38

*United States v. Sykes*, 854 F.3d 457 (8th Cir. 2017) ................................ 50

*United States v. Walker*, 688 F.3d 416 (8th Cir. 2012) ............................. 36

*Williams v. United States*, 503 U.S. 193 (1992)......................................... 50

Statutes

Title 18 United States Code, Section 3553(a).............................. 27, 30, 31

Title 29 United States Code, Section 206(a)(c) ....................................... 45

Rules

Federal Rule of Appellate Procedure 32.................................................. 51

United States Sentencing Guidelines, Chapter 5.................................... 29

United States Sentencing Guidelines, Section 2D1.1 ....................passim

United States Sentencing Guidelines, Section 1B1.3(a)(1)(A) ............. 35

United States Sentencing Guidelines, Section 1B1.3(a)(1)(B) ............. 36

United States Sentencing Guidelines, Section 4B1.3............................ 45

United States Sentencing Guidelines, Section 1B1.3............................ 40

Appellate Case: 17-2300    Page: 4    Date Filed: 09/29/2017 Entry ID: 4584463

# STATEMENT OF THE ISSUES

I.    The District Court Did Not Clearly Err In Its Sentencing Determinations.

    Apposite Authorities:
    *United States v. Darden*, 70 F. 3d 1507 (8th Cir. 1995)
    *United States v. Bradley*, 643 F.3d 1121 (8th Cir. 2011)
    *United States v. Payton*, 636 F.3d 1027 (8th Cir. 2011)

II.    The District Court Did Not Clearly Err In Finding That McArthur Maintained A Premises For Manufacturing And Distribution Of A Controlled Substance.

    Apposite Authorities:
    *United States v. Miller*, 698 F.3d. 699 (8th Cir. 2012)

III.    The District Court Did Not Clearly Err In Finding That McArthur Committed The Offenses As Part Of A Pattern Of Criminal Conduct.

    Apposite Authorities:
    *United States v. Morris*, 791 F.3d 910 (8th Cir. 2015)

IV.    Unless The District Court Cumulatively Erred By More Than Six Offense Levels, Any Error Is Harmless.

    Apposite Authorities:
    *United States v. Sykes*, 854 F.3d 457 (8th Cir. 2017)

1

## STATEMENT OF THE CASE

### Factual Background

The evidence adduced during the six-week trial of this matter was extensive. The following focuses on facts bearing most directly on claims made by Appellant.

**A.    The Native Mob.**

The Native Mob ("the NM") is a criminal street gang formed in South Minneapolis during the early 1990's. Government Trial Exhibit ("Exh.") 1; Trial Transcript ("TT") 2295-96, 3603, 5962-63. Over the years, the NM expanded in size and prominence, and by trial NM membership was estimated at over 200 individuals. TT 5119-20, 5629, 5970, 5968.

To serve its goals, the NM adopted the purposes and structure of an ongoing criminal enterprise. At first, the NM's primary function was the protection of gang's drug-distribution territory in and around South Minneapolis. TT 144, 2260, 2298, 4009-10, 4567, 5944. As drug-distribution expanded with the NM's growth into outstate Minnesota, NM members were expected to share sources for illegal drugs (TT 3311, 4929, 5347), and drug trafficking was encouraged by the NM to generate

2

money for members and to fund the purchase of firearms for the benefit of all members of the NM.  TT 3699-3700.

The NM's drug distribution activities were joined with other goals. The NM, for example, sought to protect its turf.  TT 1043-46, 1419-23, 1761-68, 2210-15, 2220-24, 2561-63, 2917-21, 3111, 3348-57, 4064-67, 4085-91.  To that end, the NM acquired, stashed, distributed, and used firearms for the benefit of the gang.  TT 144, 1101, 1106-07, 1875, 2239, 2325-26, 2376, 3322-25, 4927, 5641.

The NM also had established leadership positions.  The NM was led by a "Chief," who had the final say in all matters.  Exhs. 8, 47, 61, 89 (NM By-Laws).  Numerous witnesses identified McArthur as Chief or "Ogema" of the NM during relevant times of the conspiracies alleged in the indictment.  TT 2335-36, 3302-07, 3625, 5158, 5711.  As the NM expanded, it created representatives, called "Reps," to oversee NM members within particular geographic regions in Minnesota.  TT 2237-38, 3306, 3611.  Reps were responsible for the discipline of members, recruiting new members, and holding regional NM meetings.  TT 1110-11, 2332-33, 3306, 3611, 5128.

3

Christopher Wuori was identified both as "Treasurer" for the NM and "Rep" for the Cass Lake area of northern Minnesota. TT 3797, 5711, 5168, Exh. 499.

The NM's enterprise was also supported by non-members associated with the gang. Individuals who were not members but acted for the benefit of the gang and reaped benefits from their connection to the NM were referred to as "shorties" or as being "associated with" the NM. TT 2014-15, 2363, 3348, 4813, 4922-23, 5737-39, 4416-17. Shorties or associates might hold or sell drugs for the NM, sell guns to or hold guns for the NM, commit shootings on behalf of the gang, and/or be protected by the NM. *Id.*

NM members were expected to act for the benefit of the gang. For example, members furthered the enterprise by committing crimes, referred to as "putting in work." TT 2391, 3304-05, 3621, 4931. The crimes included violence against rival gang members (TT 3336, 3349, 3621, 4931, 5126, 5202-03), robberies (TT 3362-63, 5126), drug dealing (TT 3621, 5126), and violence against members who violated the enterprise's rules (TT 1119).

4

## A. Evidence Related to McArthur's Drug-Trafficking

Trial evidence, including the testimony of several cooperating NM members, established that Appellant was engaged in drug trafficking in connection with the NM. Dale Pindegayosh, a/k/a "J.P.", testified that he joined the NM in 2005 while in a Minnesota prison. TT 5629. Upon his release in 2009, he returned to Cass Lake and continued to associate with the enterprise, attending NM council meetings organized by McArthur and the NM "Rep" for Cass Lake, Christopher Wuori. TT 5631-33. Pindegayosh testified that selling drugs was one way of "putting in work" for the NM. TT 5636.

During the time frame of the conspiracies alleged, Pindegayosh made drug runs to Minneapolis with McArthur and Wuori to purchase cocaine. TT 5682. He testified that McArthur "pooled" his money and went "half and half" on these drugs with Wuori, and that McArthur went on several of these drug runs to Minneapolis. TT 5682-83. Pindegayosh estimated that he made 15 such runs to pick up cocaine, and on occasion, drop off NM firearms. TT 5679-80. The quantities of cocaine involved

Appellate Case: 17-2300     Page: 9     Date Filed: 09/29/2017 Entry ID: 4584463

anywhere from 9 ounces to one kilogram of cocaine.[1]  TT 5679-80.

Pindegayosh and McArthur discussed the NM drug business, including

which sources had "work" (cocaine) for them.  *Id.*

Pindegayosh testified that the powder cocaine was brought to Cass

Lake where Wuori would convert it into cocaine base - often at the White

House on Maple Avenue in Cass Lake – a residence "where Kon

[McArthur] and Chris [Wuori] were sharing a house."  TT 5642.  He

observed McArthur at the house when Wuori cooked the cocaine into

crack.  TT 5683.  Pindegayosh observed "a lot of variety of firearms" at

the White House, including .380 handguns and pistol-grip shotguns.  TT

5644-45.

Pindegayosh also testified that it was common for other NM

members to be present at the White House.  TT 5561.  Pindegayosh

recounted a particular occasion in February of 2011 when he met

McArthur and Wuori at the White House where the three NM members

---

[1] Nine ounces of powder cocaine is 252 grams.  The cocaine base
equivalent is 14 grams while the marijuana equivalent is 49 kilograms.
*See* U.S.S.G. Section 2D1.1 n.8(D).  Fifteen trips therefore generates the
cocaine base equivalent of 210 grams and a marijuana equivalent of 735
kilograms.

Appellate Case: 17-2300     Page: 10     Date Filed: 09/29/2017 Entry ID: 4584463

discussed a recently executed federal search warrant and McArthur's resulting suspicions that NM member Jeremee Kraskey had aided law enforcement in obtaining the warrant. McArthur was "storming around" the house saying "there's paperwork" on Kraskey. TT 5693-94. Trial evidence showed that Kraskey was murdered one week later after being summoned to Minneapolis from Cass Lake by NM leadership. TT 5695-5709. Kraskey was shot once in the back of the head and twice in the abdomen. TT 3011-25, 4357-75, Exhs. 729, 730, 732, 734,735, 736.

Pindegayosh estimated that between 2010 and his own federal arrest in early 2012, he obtained three to four pounds (1360 to 1814 grams) of cocaine base[2] from Wuori. TT 5678. Pindegayosh testified that he sold these drugs in smaller quantities, to include "dubs" (a half-gram quantity), grams, 8-balls (3.5 grams), or half-ounces (14 grams). TT 5676-77.

Pindegayosh testified that, in addition to himself, Wuori distributed crack cocaine to other NM members, including Anthony Cree (TT 5686), NM "enforcer" Justin Poitra, and NM member Eric Bower who, in turn,

---

[2] 1360 grams of cocaine base has a marijuana equivalent of 4760 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D).

Appellate Case: 17-2300    Page: 11    Date Filed: 09/29/2017 Entry ID: 4584463

sold these drugs on the White Earth Indian Reservation in Minnesota. TT 5687-88. Corroborating this testimony was evidence presented during trial that 11 grams of cocaine base[3] was found in Bower's apartment on the White Earth Indian Reservation at the time of his federal arrest in January of 2012. Exh. 835., TT 2975.

Pindegayosh testified that in the spring of 2011, he received a quarter-ounce of heroin from Wuori who instructed Pindegayosh to sell the heroin on the Red Lake Indian Reservation in northern Minnesota. TT 5715-5717. Pindegayosh and NM member Aaron Gilbert, a/k/a "Fatboy", sold the NM heroin on Red Lake for a week. The two men returned to Cass Lake and provided Wuori with the proceeds from the heroin sales. Pindegayosh was allowed to keep "a couple hundred dollars" from these heroin sales. Wuori told Pindegayosh that he planned to re-invest the proceeds from the heroin sales in the purchase of more cocaine. TT 5724. Pindegayosh and Gilbert then returned to Red Lake to sell more NM heroin but were arrested by tribal police. Trial evidence

---

[3] 11 grams of cocaine base has a marijuana equivalent of 38 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D).

8

included 1.3 grams of heroin packaged in cut plastic straws thrown from Pindegayosh's vehicle during his arrest. Exh. 749.

NM "War Chief" Kenny Roberts testified that after McArthur's release from prison in 2009, McArthur instructed him to bring all NM members from Minneapolis to Cass Lake for a statewide NM council meeting. TT 2327-28. McArthur wanted to "bring [the NM] name back to the community…as far as like, you know, selling drugs" and "getting at our enemies." TT 2331. At this meeting, the NM resolved to eliminate any existing threats to the gang. *Id.*; Exh. 242.

Roberts testified that in the spring of 2010, McArthur asked him to store 9 ounces of powder cocaine[4] at Roberts' mother's house in Minneapolis. TT 2354. Roberts also brought three different customers directly to McArthur to purchase crack cocaine. *Id.* This included one occasion when Roberts brought his cousin to the White House in Cass Lake to buy 28 grams of crack from McArthur who charged "between $1200 and $1400" for the cocaine base. TT 2355. Roberts described

---

[4] Nine ounces is 252 grams of powder cocaine. The cocaine base equivalent is 14 grams and the marijuana equivalent is 49 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D).

Appellate Case: 17-2300     Page: 13     Date Filed: 09/29/2017 Entry ID: 4584463

another occasion when McArthur removed an ounce (28 grams) [5] of cocaine base out of a closet at the White House then sold it to Roberts' associate. TT 2355.

Roberts testified that during the 2009-2010 timeframe, McArthur and Wuori supplied crack cocaine to him more than ten times in quantities ranging from 3.5 grams to 28 grams. [6] TT 2343-45. Roberts also saw McArthur and Wuori supply NM associate David Bower with two "8-balls" (7 grams) of cocaine base in 2009 (TT 2439, 3739) and he saw McArthur give one ounce of methamphetamine [7] and a 9mm pistol to NM member Stirling Heaton after a NM meeting in the summer of 2010. TT 2426. "Off the top of [his] head" Roberts identified Anthony Cree, Dwight Jones, Matthew Poitra, and Justin Poitra as other NM members who were supplied crack cocaine by McArthur and Wuori. TT 2351.

---

[5] These two ounces equal 56 grams of cocaine base, which has a marijuana equivalent of 196 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D).

[6] Using the smallest quantity (3.5 grams), this totals 35 grams of cocaine base supplied to Roberts by McArthur and Wuori, which has a marijuana equivalent of 122 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D).

[7] One ounce is 28 grams. The marijuana equivalent of 28 grams of methamphetamine is 56 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D).

10

Roberts testified that McArthur and Wuori stored their drugs at the White House in Cass Lake. TT 2346-47. He witnessed McArthur and Wuori exchanging crack cocaine with each other in this residence on five or six occasions and he observed Wuori cooking "a lot of cocaine into crack" at the White House, testifying "I seen [Wuori] there all day cooking, so it had to have been at least eight to nine ounces at a time." TT 2346 – 48. He testified that the preparation of crack cocaine "was common knowledge of everybody who has been at the house…." TT 2349. Roberts recounted that McArthur and several other NM members were often present when Wuori converted the powder cocaine into crack cocaine and that he had assisted Wuori in packaging the crack for sale in the White House in the spring of 2010. TT 2349.

NM member Dwight Jones testified that McArthur and Wuori sold crack cocaine together in Cass Lake during the conspiracies alleged. Between 2009 and 2010, Wuori supplied Jones with at least four ounces (112 grams) of crack cocaine that belonged to both McArthur and Wuori[8], recalling statements Wuori made when collecting drug debts, such as

---

[8] 112 grams of cocaine base has a marijuana equivalent of 392 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D).

Appellate Case: 17-2300    Page: 15    Date Filed: 09/29/2017 Entry ID: 4584463

"Kon [McArthur] wants the money" or "Kon is asking [me] to come get the money." TT 4584. Jones identified Cree as selling 8-ball quantities of crack cocaine in Cass Lake that Wuori had supplied. TT 4585-4586. Jones himself sold the crack supplied by McArthur and Wuori to others in the Cass Lake area, including other NM members. TT 4578-4581.

Jones identified the 'White House' as a residence in Cass Lake used by McArthur and Wuori to operate their drug business. TT 4579. On one occasion, McArthur accessed a safe in the bedroom of the White House and provided crack cocaine to Jones. TT 4644. Jones saw Wuori using the microwave oven at the house to cook powder cocaine into crack. On some of these occasions, McArthur was present. On one occasion in particular, he witnessed Wuori hand a "couple of ounces" (56 grams) of cocaine base[9] to McArthur that Wuori had just cooked up in the kitchen of the White House. TT 4580-83.

Jones also observed handguns and a rifle at the White House. *Id.* Jones testified that he was present in the White House in 2009 when McArthur and Wuori issued an order to other NM members that the rival

_____

[9] 56 grams of cocaine base has a marijuana equivalent of 196 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D).

12

drug dealer, Lawrence Daniels, a/k/ "Sonic", was "on sight" – meaning targeted to be shot. TT 4607-08.

NM member Bear Conway testified at trial that he had been a member of the NM since 2000, having been recruited into the organization at age 17 by his uncle, Gordon Reese. TT 3601-02. He continued his association with the NM until 2010, when he began to work as an informant for law enforcement. Conway testified that selling drugs, committing drive-by shootings, and assaulting people were ways to maintain status within the organization and that all of these topics were discussed at NM council meetings led by McArthur. TT 3621-23, 3745. Conway testified that Wuori trafficked both powder and crack cocaine and that he was with Wuori on two occasions when Wuori obtained cocaine from a source of supply. TT 3745-47. Conway had also observed Wuori cooking powder cocaine into crack cocaine on two occasions using the microwave in the kitchen of Wuori's house in Cass Lake. TT 3745.

Mike Hecimovich, a/k/a "Dope Boy", testified that he joined the NM while serving a 3-year prison sentence in Minnesota. When he was released from prison in 2009, he continued to associate with NM members and to participate in the racketeering enterprise by committing robberies,

13

shootings, and selling illegal drugs. TT 5140. Hecimovich testified that McArthur discussed NM drug trafficking during "a couple" of NM council meetings (TT 5355) and that "selling dope" was the primary way that NM members made money. TT 5346.

Hecimovich identified Wuori as a primary source for crack cocaine. *Id.* Wuori brought crack cocaine from Cass Lake to Minneapolis to supply the co-chief of the NM, Shawn Martinez. TT 5353-54. Hecimovich, in turn, purchased 3.5 gram and 7-gram quantities of crack from Martinez during the conspiracies alleged. In addition to the crack cocaine, Hecimovich sold at least one pound (453 grams) of methamphetamine during his tenure with the NM. TT 5353. "Three and half, maybe four ounces" of this methamphetamine[10] was obtained through armed robbery committed with other members of the NM, including the co-chief of the NM, Shawn Martinez and NM member Mayson Lueck. TT 5285-90, 5351. Hecimovich testified that he and the other NM members split the stolen methamphetamine each member taking a half to three-fourths of an ounce of the robbery's proceeds. *Id.* This was only one of several

---

[10] 3.5 ounces is 98 grams of methamphetamine. The marijuana equivalent is 196 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D).

14

armed robberies committed with members of the NM during the conspiracies alleged. TT 5262.

NM member Mayson Lueck testified that he joined the NM in early 2010 and that McArthur was Chief of the NM during this time. TT 3302-07. Lueck said that he "put in work" for the NM by selling drugs and committing assaults. TT 3304. Lueck first met Wuori at a NM council meeting in June of 2010 and within two months had purchased 48 grams of crack cocaine from him. TT 3310-11, Exh. 595. In a separate transaction in 2010, Lueck obtained 70 grams of crack cocaine from Wuori which he, Cory Oquist, and two other NM members then sold on a reservation in Wisconsin, then shared the proceeds. TT 3314-15. Lueck admitted that he participated in an armed robbery in 2010 with NM co-chief Shawn Martinez, Hecimovich, and a third NM member in which they obtained a multi-ounce quantity of methamphetamine. TT 3362.

Lueck had observed Wuori cooking 28 grams of crack[11] at the White House in Cass Lake in 2010 while McArthur and several other NM members, including Jeremee Kraskey and Cory Oquist were present. TT

---

[11] 28 grams of cocaine base has a marijuana equivalent of 98 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D).

15

3312-13.  Lueck testified that he had seen McArthur at the White House on other occasions as well. TT 3317-18.  Lueck observed firearms at the White House, including a mini 14 rifle and a 9mm pistol located under a couch.  TT 3317.

Justin Hollins testified that he participated in trafficking powder cocaine in Minneapolis in late 2009 through 2010.  Hollins met Wuori through Hollins' partner, Fields.  TT 5475.  Hollins testified that from December of 2009 until June or July of 2010, Wuori travelled to Minneapolis every three weeks to purchase between 5 and 10 ounces of powder cocaine[12] from him and that McArthur accompanied Wuori on at least one of these trips. 5475-77.

Randall Seelye testified that he was recruited into the NM by McArthur in 2006.  TT 4918-19.   When both men were out of prison they engaged in criminal activity together "focused around dope and pistols." TT 4920.   Seelye described pooling his money with McArthur and other

---

[12] Five to ten ounces is 140 to 280 grams of powder cocaine. The marijuana equivalent would be 28 to 56 kilograms per trip. *See* U.S.S.G. Section 2D1.1 n.8(D).  For a seven-month period (December through June), this totaled between 196 and 392 kilograms of marijuana.

Appellate Case: 17-2300     Page: 20     Date Filed: 09/29/2017 Entry ID: 4584463

Native Mob members to jointly purchase 9 ounces[13] of cocaine from a relative of NM member Gordon Reese's during the time frame of the conspiracy. This cocaine was brought to the Cass Lake area for further distribution by members of the NM. TT 4923-25.

Seelye also testified about the May 2011 controlled buy of 3.6 grams of crack cocaine from McArthur and Wuori in Cass Lake, Minnesota. TT 4801-14, Exh. 763.[14] Approximately one month later, Seelye conducted another controlled purchase of 6 grams of crack cocaine from Wuori at the White House on Maple Avenue. TT 4814-16, Exh. 765.

Amanda Carlson testified that McArthur, Wuori, and members of the NM were trafficking heroin and other drugs in addition to the cocaine base described above. Carlson testified that she had been receiving "pain pills" from members of the NM in Cass Lake, who then directed her to specific customers. TT 4280-82. Carlson testified that in late March of 2011, she met McArthur, Wuori, and NM member Alden Fairbanks,

---

[13] Nine ounces of powder cocaine is 252 grams of powder cocaine, which has a marijuana equivalent of 98 kilograms. *See* U.S.S.G. Section 2D1.1(c)(drug quantity table).

[14] This is the conduct underlying overt act KKK in Count 1 and the substantive allegation contained in Count 8.

17

a/k/a "Bro", at a house in Cass Lake.  She observed Wuori cutting and filling plastic straws with a brown powder consistent with heroin.  TT 4288-89, 4293.  With McArthur present, Wuori asked her to sell the heroin because "it's better than pills" and was cheaper.  TT 4293.  Approximately one week after this meeting with McArthur, Wuori, and Fairbanks, a search warrant was executed at Carlson's trailer home in Cass Lake.  NM member Fairbanks was present and when searched, officers found 14 cut straws containing 2.5 grams of heroin in his pocket as well as a handgun.  Exh. 756, TT 4754-55.  Elsewhere in Carlson's home, officers found a large quantity of empty cut plastic straws consistent with those used to package the heroin found in Fairbanks' pocket.  Exh. 762.

In February of 2011, law enforcement executed a search warrant for gang documents at 316 Maple Avenue in Cass Lake – the location commonly referred to as the White House.  McArthur and his girlfriend were present on this occasion.  TT 4766.  No drugs were found, but officers seized an number of NM-related items including a MoneyGram receipt showing a money transfer between the former NM leader Wambli McArthur and Wuori (Exh. 702), a t-shirt with the words "I rep Cass Lake Mafia World, NM" on it (Exh. 703, TT 4769), photographs of NM

18

members throwing NM gang signs with their hands (Exh. 706), a packet of police reports related to NM member William Morris' boiling-water assault against suspected informant Richie Norton (Exh. 709), a criminal complaint and summons for NM member Cory Oquist, a/k/a "Guns"[15] (TT 5569, Exh. 710), a duffel bag containing an inmate property sheet and social security card for NM member Pedro "P.J." Sayers (Exhs. 711, 720), and a mailing to McArthur himself from federal inmate and NM member Anthony Smith dated January 5, 2011 (Exh. 712) in which Smith discussed NM-related business. TT 4773-74.

During trial, the jury also heard evidence of McArthur and Wuori's efforts to drive away drug competition in the areas that the NM sold their drugs. This included the NM's attempted murder of the rival drug dealer named Lawrence Daniels, a/k/a "Sonic." Daniels was operating on the same turf as the NM. TT 2344-50, 5648-49, 5680-83.

_____

[15] When Oquist was arrested at a search warrant in November of 2011 by the Leech Lake Tribal Police Department, he was in possession of one gram of crack cocaine. Exhs. 800, TT 2162. Pindegayosh testified that Oquist was one of several NM members who sold crack supplied by Wuori and McArthur. TT 5676-77. Oquist also drove the NM members to the Wilke residence to do the home-invasion ordered by McArthur. TT 5720.

19

Roberts explained that in 2010, McArthur, Wuori, and he discussed Daniel's drug trafficking in NM territory. TT 2399-2401. McArthur and Wuori planned to find out where Daniels was living and "eliminate him by any means and get him off, get him off Cass Lake." TT 2403; *see also* TT 2404 (NM member Roberts recounting McArthur and Wuori's goal to find Daniels and "eliminate the competition"). Jones testified that sometime in 2009 or 2010, while at the "White House", McArthur told members of the NM it was "on sight" with Daniels. TT 4608. Pindegayosh also testified that Daniels was a rival drug dealer of the NM's and that the leadership's plan was to shoot Daniels. TT 5648-52.

The NM's plan to "eliminate" Daniels as drug competition resulted in several armed attempts on residences the NM believed were associated with Daniels. After the two armed attempts on Daniels' life in 2010, Daniels and his associates were still selling drugs in the Cass Lake area in "direct competition" with the NM. TT 5718 (testimony of NM member Pindegayosh).

In addition to getting the word out to shoot Daniels on sight, the Cass Lake Council, including McArthur and Wuori, decided the NM would continue its efforts to protect its drug turf against Daniels,

20

including by home invasion. TT 5718-19. Pindegayosh, at McArthur and Wuori's request (TT 5719), volunteered for the mission, joining three NM members and a NM prospect (TT 5724). They went to the "weapons stash" and got firearms, ultimately carrying a total of three guns and a set of brass knuckles for the home invasion. TT 5719. NM member Cory Oquist was the driver for the group. TT 5720.

On March 28, 2011, Pindegayosh and the other NM members executed the home invasion on the residence of sixty-two year old John Wilke, a resident of Cass Lake and the father-in-law of Daniels. Daniels had lived with Wilke in the past (TT 5091), and in 2010 drugs and a gun had been seized by law enforcement at the residence (TT 3573-75). As the NM entered, they yelled "police," used firearms to threaten and assault Wilke, and demanded to know where "Sonic G's stuff was." TT 5092-94. After being told by Wilke that Daniels did not live there and had nothing stored there, the NM members rummaged through the house (TT 5094-95) saying "this is their territory, nobody is doing nothing around here but us." TT 5095.

During the June 11, 2011 council meeting, McArthur and Wuori discussed their shared sources for illegal drugs. Exh. 764. With Wuori

Appellate Case: 17-2300    Page: 25    Date Filed: 09/29/2017 Entry ID: 4584463

present, McArthur said: "It's just we could (inaudible) give you our phone number and the connect we got now, really doesn't mean nothing. Because, n****, we've ran into 5 or 6 different connects within the last five or six months...We haven't had the same connect the whole time." *Id.*

At trial, McArthur admitted that he was engaged in selling large quantities of marijuana during the conspiracies alleged and that he did so with NM member Jeremee Kraskey. TT 6466. He testified that after his release from prison, his "hustle" was to sell "pounds of marijuana" that he obtained from St. Paul, Minnesota. He estimated that the total quantity was "over 100 pounds"[16], which he then distributed on the reservations of northern Minnesota. TT 6402. McArthur testified that he applied for jobs upon his release from prison but "got denied." TT 6397. He testified that the tribe gave him a job but he lost it after violating parole and going back to prison. TT 6399.

He testified to no other legitimate income from the time he was released from prison after serving a sentence for murder and the time he was arrested in the present case. The Revised PSR showed a total income

_____

[16] 100 pounds of marijuana is the equivalent of 45 kilograms of marijuana.

22

for the five-year period between release from state prison and federal arrest of just over $20,000.  Further, McArthur did not file income tax returns from 2008 to 2012.  RPSR ¶ 413.

The RPSR stated "[t]he Native Mob was the defendant's life.  As leader of the Native Mob he ensured fellow gang members sold drugs and engaged in violent criminal acts to maintain his leadership and lifestyle throughout the conspiracy."  RPSR ¶ 343.

Appellate Case: 17-2300    Page: 27    Date Filed: 09/29/2017 Entry ID: 4584463

## Procedural Background

### A.     Indictment.

In January 2012, twenty-four (24) defendants were named in a forty-seven count Indictment.  DCD 18.  All twenty-four defendants were charged with Conspiracy to Participate in Racketeering Activity based upon their involvement with the NM, along with one or more additional conspiracy, violent crime, gun, and drug offenses.  *Id.*  In the end, all but the three defendants – McArthur and two of his co-defendants - resolved this matter with pleas of guilty.

### C.     Trial Proceedings.

In late January 2013, McArthur and two co-defendants proceeded to jury trial before the Honorable Judge (now Chief Judge) John R. Tunheim.  DCD 978.  For purposes of trial, a redacted Superseding Indictment was prepared and filed.  DCD 1096.  The redacted Superseding Indictment reflected only the counts relevant to McArthur and the two co-defendants and renumbered those counts consecutively. Appellant and the government use those count numbers throughout the briefing.

After six weeks of trial, the jury returned its verdicts in March 2013. DCD 1097. McArthur was convicted of Conspiracy to Participate in Racketeering Activity (Count 1); Conspiracy to Use and Carry Firearms During and in Relation to a Crime of Violence (Count 2); Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances (Count 7); Distribution of a Controlled Substance (Count 8); and two counts of Use and Carrying of Firearm During and in Relation to a Crime of Violence (Counts 10 and 11).

## D.    Sentencing Proceedings.

Following trial, a Presentence Report was prepared by the U.S. Probation Office. The government and Appellant filed written sentencing position pleadings with the District Court. DCD 1381-82, 1402, 1408. Chief Judge Tunheim held a sentencing hearing for Appellant on September 30, 2014. McArthur objected to the PSR including the drug quantity under U.S.S.G. Section 2D1.1, the application of the "stash house" enhancement under U.S.S.G Section 2D1.1(b)(12), and the application of the pattern of criminal conduct engaged in as a livelihood enhancement under U.S.S.G Section 2D1.1(b)(14). DCD 1382, McArthur Sent. Tr. at 1, 3.

Appellate Case: 17-2300    Page: 29    Date Filed: 09/29/2017 Entry ID: 4584463

McArthur's first sentencing hearing began with an evidentiary hearing. DCD 1548, McArthur Sent. Tr. (hereafter "ST 1") at 4-72. The government called two witnesses, both of whom testified to McArthur's continued NM-related activity while pending sentencing in this matter. *Id.* The testimony included evidence about an attempt - linked to McArthur through recorded jail phone calls - to smuggle methamphetamine into the jail and the playing of recorded jail calls in which McArthur discussed ongoing NM activity. *Id.*

Chief Judge Tunheim received argument on guidelines calculations and the sentencing options available pursuant to statute. *Id.* at 72-99. Chief Judge Tunheim denied McArthur's objections as to the three Guidelines factors at issue in this appeal, as well as others. *Id.* at 102-104, 106. Chief Judge Tunheim concluded that the total offense level was 49 but reduced that to 43, referencing Chapter 5, Part A, Application Note 2. *Id.* at 107. He found that McArthur's Criminal History Category was III and the resulting advisory guidelines range was life in prison. *Id.*

McArthur's counsel requested a total sentence that envisioned an "out date" for McArthur rather than a sentence of life in prison. *Id.* at 107-114, 118. The government, recounting McArthur leadership of the NM's

26

profoundly violent enterprise and the present and future threat posed by McArthur to the safety of the community, requested a total sentence of life imprisonment. *Id.* at 114-117.

The District Court imposed a sentence of 516 months' (43 years) imprisonment. *Id.* at 121-22. The District Court noted the sentence was a downward variance from the advisory guidelines range of life imprisonment, giving McArthur an "out date." *Id.* at 122. Chief Judge Tunheim stated he fashioned the sentence to balance the "enormity of these crimes, and they were enormous and well proven at trial in the Court's view" with a desire to give McArthur an "out date" as an incentive to focus on the future. *Id.* at 124. The District Court concluded the total punishment was consistent with the Section 3553(a) sentencing factors. *Id.* at 122-25.

Defendant appealed his convictions and sentence to the Eighth Circuit. His convictions were affirmed with the exception of Count 11. The Eighth Circuit granted the government's request to vacate the conviction on that count and remanded the case for re-sentencing on all remaining counts under the "sentencing package doctrine." *See United States v. McArthur*, 836 F.3d 931, 947 (8th Cir. 2016).

27

### E. Remand and Resentencing

Following the remand, a Revised Presentence Report was prepared by the U.S. Probation Office. The government and Appellant filed written sentencing position pleadings with the District Court. DCD 1710, 1714. McArthur renewed his objections from his initial position pleadings, except those relating to Count 11. Chief Judge Tunheim held a re-sentencing hearing for Appellant on May 31, 2017.

McArthur's re-sentencing hearing began with an evidentiary hearing. DCD 1740, McArthur Sent. Tr. (hereafter ST 2) at 4-72. The government offered exhibits probative of McArthur's NM-related activity since his 2014 federal sentencing. This included a packet of emails both written by, and sent to, McArthur while in Bureau of Prisons custody following his 2014 sentencing. Exh. 1. In one email communication, NM member Robin Lussier sought confirmation from McArthur that Lussier had been promoted within the ranks of the gang. *Id.* at 16. In another email, McArthur wrote Lussier boasting that he [McArthur] was "proud to be doing time" for the NM. *Id.* at 18. The witness also testified about recorded phone calls taking place between 2015 and 2017 in which various NM members discussed McArthur's on-going association within

28

the NM criminal enterprise after his 2014 federal sentencing. ST 2, pp. 21 – 27.

Chief Judge Tunheim noted McArthur's guidelines objections and overruled them. *Id.* at 98. The District Court adopted the factual statements in the Revised PSR, then calculated the advisory Guidelines range. *Id.* at 99-100.

As to Pseudo Count group 4 in the RPSR, the District Court found the base offense level was 30 (a marijuana equivalent of 1000 to 3000 kilograms), applied a two-level increase for possession of a firearm, a two-level increase because of the credible threat of violence, a two-level increase for maintaining a premises for the purposes of manufacturing or distributing controlled substances, a two-level increase because the offense was part of a pattern of criminal conduct, a two-level increase for the use of minors, and a two-level increase for obstruction of justice. *Id.* at 100. The District Court added an additional point under Section 3D1.4 for the multi-count adjustment, bringing the total offense level to 49 (*Id.* at 101) then reduced the offense level to 43 under U.S.S.G. Chapter 5, Part A, Commentary, Application Note 2. *Id.* Finding McArthur's Criminal

Appellate Case: 17-2300   Page: 33   Date Filed: 09/29/2017 Entry ID: 4584463

History Category was III, the District Court determined the advisory guidelines range was life in prison.  ST 2, p. 101.

Chief Judge Tunheim received argument from both counsel on the appropriate sentence based upon the considerations set forth in 18 U.S.C. Section 3553(a).  *Id.* at 100-117.  McArthur's counsel requested a total sentence of 360 months.  The government sought a sentence of at least 516 months – the sentence imposed in 2014.

The District Court imposed a sentence of 480 months' (40 years) imprisonment.  DCD 1743, *Id.* at 121-22.  Chief Judge Tunheim imposed a sentence of 240 months on Counts 1, 2, and 8 and a 420 month sentence on Count 7, all to be served concurrently, and a 60 month consecutive sentence on Count 10.  ST 2, 144.  The District Court noted the sentence was a downward variance from the advisory guidelines range of life imprisonment, noting "some level of post offense rehabilitation", "some level of post offense rehabilitation", and the elimination of Count 11.  *Id.* at 142-43.  Chief Judge Tunheim stated he fashioned the sentence to account for his concern regarding the "enormity of the crimes over a long period of time."  *Id.* at 143.  The District Court concluded the total

punishment was consistent with the Section 3553(a) sentencing factors.

*Id.* at 144.

## SUMMARY OF THE ARGUMENT

Appellant Wakinyan McArthur, a/k/a "Kon", was the undisputed leader of a criminal enterprise responsible for violence, witness intimidation, drug trafficking, and a wide variety of other criminal acts. He personally sold and aided his fellow enterprise members in the sale of illegal drugs such as cocaine base and heroin from 2009 until his arrest in 2012.

The District Court did not err in finding McArthur responsible for the equivalent of 1000 to 3000 kilograms of marijuana – a base offense level of 30. The trial evidence established beyond a preponderance of the evidence equivalent quantities of cocaine base exceeding a base offense level of 30. Nor did the District Court err in finding that McArthur maintained a premises for the purpose of manufacturing or distributing a controlled substance or in applying an enhancement for engaging in criminal conduct as a livelihood. Assuming *arguendo* that the District Court did err in calculating the advisory Guidelines range, unless such error amounted to an erroneous increase of at least seven levels, such error was harmless.

32

All sentencing factors at issue in this appeal were amply supported by the evidence in the case and any alleged error was harmless. The judgment of the District Court should be affirmed.

Appellate Case: 17-2300    Page: 37    Date Filed: 09/29/2017 Entry ID: 4584463

# ARGUMENT

## I. THE DISTRICT COURT DID NOT CLEARLY ERR IN ITS SENTENCING DETERMINATIONS.

### A. Standard of Review.

The government bears the burden of establishing drug quantity and sentencing enhancements by a preponderance of the evidence. *United States v. Mannings*, 850 F.3d 404, 408 (8th Cir. 2017). The Court of Appeals reviews the District Court's factual findings for clear error and the ultimate sentence for reasonableness. *Id.*

### B. Drug Quantities

The RPSR and the District Court determined that McArthur be held responsible for 1000 to 3000 kilograms of marijuana, which generates a base offense level of 30. RPSR para. 338; ST 2 at 100. The equivalent quantity of cocaine base (crack cocaine) is at least 280 but less than 840 grams. *See* U.S.S.G. Section 2D1.1(c)(drug quantity table).

McArthur argues that he should be held responsible for only one gram of cocaine and 28 grams of cocaine base with a corresponding base offense level of 24. McArthur's Br. at 15. McArthur acknowledges an "uphill battle" in challenging the District Court's determination of drug

34

quantity on appeal. McArthur's Br. at 13. Indeed, this Court will reverse "only if the entire record definitely and firmly convinces [the Court] that a mistake has been made." *United States v. Allen*, 440 F.3d 449, 452 (8th Cir. 2006).

"[A] defendant is accountable for 'relevant conduct' including 'all acts and omissions committed, aided, abetted, counseled … or willfully caused by the defendant…that occurred during the commission of the offense of conviction." *United States v. Darden*, 70 F. 3d 1507, 1545 (8th Cir. 1995) (citing U.S.S.G. § 1B1.3(a)(1)(A)). "In a drug conspiracy case, the district court may consider amounts for drug transactions in which the defendant was not directly involved if those dealings were part of the same course of conduct or scheme." *United States v. Bradley*, 643 F.3d 1121, 1126 (8th Cir. 2011). In a narcotics trafficking conspiracy, "the sentencing court may consider all transactions[,] known or reasonably foreseeable to the defendant," that furthered the conspiracy. *United States v. Payton*, 636 F.3d 1027, 1046 (8th Cir. 2011). Even "[d]rug quantities purchased for personal use by a member of the conspiracy are relevant in determining

35

the total drug quantity attributable to the defendant." *United States v. Walker*, 688 F.3d 416, 422 (8th Cir. 2012).

Further, "in the case of jointly undertaken criminal activity" like the racketeering enterprise here, a defendant may be sentenced for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity that occurred during the commission of the offense of conviction. *Darden*, at 1546 (8th Cir. 1995)(citing U.S.S.G. § 1B1.3(a)(1)(B)). Relevant conduct also includes uncharged conduct that is part of the same course of conduct as the offense of conviction and is "a fact-intensive inquiry." *United States v. Ault*, 446 F.3d 821, 823 (8th Cir. 2006).

Trial evidence included overwhelming evidence as to the broad scope of the racketeering conspiracy and McArthur's leading role in it. One aspect of McArthur's enterprise was drug-trafficking. Indeed, one of McArthur's convictions for Conspiracy to Distribute and Possess With Intent to Distribute Controlled Substances (Count 7). The testimony from trial established that McArthur and Wuori were partners in a multi-drug conspiracy that ran unimpeded for over two years. Cooperating witnesses Roberts, Jones, Conway, Carlson, Pindegayosh, Seelye,

36

Hecimovich, and Hollins each testified regarding McArthur's role in trafficking powder cocaine, crack cocaine, heroin, methamphetamine, marijuana, and other drugs. Corroborating this testimony was evidence of numerous quantities of controlled substances seized from various members of the NM, including a controlled buy of crack cocaine directly from McArthur and Wuori in Cass Lake in 2011. The evidence also showed that when McArthur and Wuori's drug trafficking business was threatened, they conspired to eliminate the competition through violence and the use of firearms.

The preponderance of the evidence showed that the quantity of cocaine base alone attributable to McArthur during the conspiracies exceeded 2000 grams, which has a marijuana equivalent of 7000 kilograms. As such, the District Court did not clearly err in finding McArthur responsible at least 280 grams of cocaine base, or the marijuana equivalent of at least 1000 kilograms.

The three to four pounds of crack cocaine (TT 5678) that Pindegayosh attributed to Wuori and McArthur adds over 1300 grams to McArthur's relevant conduct. This exceeds the 840 grams necessary to achieve the base offense level of 30 found by Chief Judge Tunheim.

37

While the government offered a variety of corroborative pieces of evidence, the testimony of a co-conspirator alone may be sufficiently reliable for the court to base its drug quantity calculation for sentencing purposes. *United States v. Payton*, 636 F.3d 1027, 1046 (8th Cir. 2011). But the cocaine base received by Pindegayosh from McArthur and Wuori is only part of the body of evidence.

Apart from Pindegayosh, other trial witnesses provided compelling evidence supporting the District Court's findings. Roberts testified that during the conspiracy, McArthur asked him store a 9-ounce quantity of cocaine in Minneapolis and that he brought several crack customers to McArthur, including one who purchased 28 grams of crack cocaine directly from McArthur. He also testified that McArthur and Wuori exchanged cocaine base with each other on "five or six" occasions during the conspiracies alleged. TT 2346.

The District Court had the testimony of Dwight Jones who testified that McArthur and Wuori supplied him with crack cocaine between 2009 and 2010 and he recounted 56 grams of crack cocaine transferred between McArthur and Wuori at the "White House." Another witness, Randall Seelye, testified that he, McArthur, and other NM members pooled

38

money to buy powder cocaine in 2009. Then in 2011 while working for law enforcement, Seelye bought 3.5 grams of cocaine base directly from McArthur and Wuori and 6 grams from Wuori at the White House a short time thereafter. Not only did this evidence add cocaine base to McArthur's relevant conduct, but it corroborated the witnesses identifying McArthur and Wuori as partners in NM cocaine base trafficking. Witness Hollins' testimony linked McArthur to Wuori during another 9-ounce cocaine transaction in 2009 and further corroborated witnesses who identified these two NM members as partners in their drug-trafficking activities.

Beyond the government's witnesses, McArthur's own recorded words in 2011 confirmed the joint nature of McArthur and Wuori's drug-trafficking operation. In the June NM council meeting that year, McArthur admitted that he and Wuori had been sharing multiple sources of supply. Exh. 764.

In the face of this overwhelming evidence, McArthur's argument regarding drug quantity must be rejected. He bases his argument that he is responsible for one gram of cocaine and 28 grams of cocaine base on a selective portion of only a few of the government's many witnesses, a

39

reading of the trial evidence in a light most favorable to himself, and an unsupported claim that the District Court should have used "the amounts at the low-end of the jury's findings…" McArthur's Br. 15. While minimizing the testimony of Pindegayosh, Jones, and Roberts, he completely ignores the compelling evidence found in the testimony of witnesses such as Hollins, Carlson, Conway, Seelye, Lueck, and Hecimovich. He also ignores the body of evidence showing that McArthur knew of, encouraged, aided, then rewarded his co-conspirator's drug-trafficking activities.

Guidelines § 1B1.3 addressing relevant conduct for sentencing applies to a participant like McArthur who "understands the full extent of the conspiracy." *Ramey v. United States*, 8 F.3d 1313, 1315 (8th Cir. 1993). McArthur understood that drug dealing was part and parcel of membership in the enterprise he oversaw. McArthur encouraged his gang members to "put in work" because everyone was expected to contribute to the enterprise in one fashion or another. The evidence presented during trial amply demonstrated that no defendant in this case understood the full extent of the NM racketeering and drug-trafficking conspiracies better than McArthur. The District Court's finding that

40

McArthur was responsible for over 1000 kilograms of marijuana was not clearly erroneous. Its judgment should be affirmed.

## II. THE DISTRICT COURT DID NOT CLEARLY ERR IN FINDING THAT MCARTHUR MAINTAINED A PREMISES FOR MANUFACTURING AND DISTRIBUTION OF A CONTROLLED SUBSTANCE.

Guidelines § 2D.1.1(b)(12) recommends a two-level increase if "the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." Application Note 17 states "[s]ubsection (b)(12) applies to a defendant who knowingly maintains a premises (*i.e.*, a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution."

Application Note 28 to § 2D1.1 instructs that "[m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled

41

substance and how frequently the premises was used by the defendant for lawful purposes."

The District Court's decision to apply a two-level increase under this provision of the guidelines was based upon a large body of corroborated evidence. Numerous cooperating witnesses testified at trial that they frequently observed McArthur and Wuori engaged in drug-distribution activities the White House on Maple Avenue in Cass Lake, Minnesota during the time frame of the conspiracies alleged.[17] Those witnesses also testified that the home was frequented by many members of the NM and that firearms were often present. A drug-trafficking expert from the Minneapolis Police Department testified that firearms are

---

[17] McArthur has identified the White House as his family home on Grant Utley Avenue in Cass Lake. McArthur's Br. at 20-21. This assertion is inconsistent with the evidence presented at trial. For example, Investigator Mark Rogers testified that 316 Maple is the "White House" associated with McArthur and Wuori. TT 5870. Pindegayosh testified that the White House shared by McArthur and Wuori was located on Maple Avenue. TT 5642. Officer William Beise identified the "White House" as the home located at 316 Maple Avenue in Cass Lake. TT 4814. He testified that McArthur was present at this location when officers executed a document warrant at that premises on February 18, 2011. 4765-66.

commonly used by those involved in drug trafficking for protection. TT 5936.

The trial witnesses familiar with the enterprise testified that McArthur and Wuori used the White House for cooking powder cocaine into crack cocaine, as well as for packaging and distributing drugs. Jones, Roberts, Seelye, Conway, and Pindegayosh all described how Wuori and McArthur used the home on Maple Avenue to store narcotics and how Wuori frequently used the microwave oven in the kitchen of this house to cook the powder cocaine into cocaine base, which was then distributed to NM members. TT 2346-48, 3745, 4580-82. McArthur and Wuori also used this house to discuss with other NM members the shooting of a rival drug dealer. TT 4607-08. Clearly, "[t]hese drug distribution activities were more than an 'incidental or collateral' use of the premises…" *United States v. Miller*, 698 F.3d. 699, 706-07 (8th Cir. 2012).

McArthur even encouraged members of the NM to use his residence to prepare drugs for distribution. McArthur stated on tape: "I got a crib, niggers could stay in my crib, they can fuckin' cut their shit up nigger, if they bring any dope in the crib though, in my house, and the-and the cops come in, they gotta take the rap for that, you know what I'm

43

saying?  Don't-don't put it off on me, our-(IA) we'll put you on your feet nigger."  Exh. 499.  Given that multiple witnesses familiar with NM drug-trafficking practices identified the house on Maple Avenue as that used by McArthur and Wuori to cook NM cocaine into crack, to package and distribute the crack, to store NM weapons, and to discuss the murder of a rival drug-dealer in the Cass Lake area, the preponderance of the evidence suggests that McArthur was indeed referring to the White House on Maple, and not his family's residence on Grant Utley, when making this admission.   Further corroborating the testimony about the White House was the evidence recovered in the document warrant in 2011, which included NM t-shirts, financial documents of NM members, police reports from NM-related crimes, and the personal property of several different NM members.  TT 4769-74.

Viewing the record as a whole, it is clear that one of the primary or principal uses for the White House was McArthur and Wuori's substantial NM-related drug trafficking activities.  Therefore, the District Court's finding that McArthur maintained a premises for the purpose of

Appellate Case: 17-2300     Page: 48     Date Filed: 09/29/2017 Entry ID: 4584463

drug manufacturing and distribution was not clearly erroneous. Its judgment should be affirmed.

### III. THE DISTRICT COURT DID NOT CLEARLY ERR IN FINDING THAT MCARTHUR COMMITTED THE OFFENSES AS PART OF A PATTERN OF CRIMINAL CONDUCT.

Guidelines § 2D1.1(b)(15)(E) subjects a defendant to a two-level increase in the advisory Guidelines range if the offense was committed as part of a pattern of criminal conduct engaged in as a livelihood. The technical element of this enhancement is that the defendant's illegal income must have exceeded 2,000 times the hourly minimum wage under federal law during any twelve-month period. U.S.S.G. § 2D1.1, Application Note 20(C), *citing* U.S.S.G. § 4B1.3, Application Note 2. During the time period at issue, the federal minimum wage was $7.25 an hour. 29 U.S.C. § 206(a)(c). The RPSR recommended this two-level increase, noting "the Native Mob was the defendant's life. As the leader of the Native Mob he ensured fellow gang members sold drugs and engaged in violent criminal acts to maintain his leadership and lifestyle throughout the conspiracy." RPSR ¶ 342.

The RPSR noted that McArthur had reported income of $2,406 and $17,966 in 2008 and 2009 respectively. *Id.* at ¶ 410. The RPSR also found

45

that McArthur did not file a tax return in any of the years between and including 2008 and 2012. *Id.* at ¶ 413. McArthur reported to probation having no assets and no liabilities and a credit report revealed no credit history. *Id.* at ¶ 412.

Trial evidence showed that during the conspiracies alleged, McArthur and Wuori charged between $40 and $70 per gram of cocaine base. For example, McArthur charged $250 for 3.6 grams of crack cocaine ($71 per gram)(*See* TT 4807-4808, Exh. 940A) but when sold in larger quantities, the price dropped to approximately $46 per gram. TT 2355. As set forth above, McArthur's relevant conduct as to cocaine base alone exceeds 2000 grams. Using these prices and quantities, McArthur's untaxed income from cocaine base alone ranged from $92,000 to $140,000. Dividing by the 3 years that McArthur was not in prison (February of 2009 through arrest date of February 2, 2012) results in an average income of between $30,600 and $46,600 per year – figures all in excess of $14,500 (2000 x $7.25/hour minimum wage) even considering the "half and half" split with Cass Lake NM "Rep" Chris Wuori ($15,300 to $23,300).

46

Notably, these figures do not include the income generated by his sales of pills, powder cocaine, heroin, and any other illegal drug.

Beyond the income generated by the sale of cocaine base and other NM drugs, McArthur himself testified that he made money following release from prison by selling "probably over 100 pounds" of marijuana (TT 6402) and some of that was with fellow NM member Jeremee Kraskey. TT 6466. He further acknowledged that he and Wuori were very close – describing him as "a little brother" – and that they shared money and traveled together. TT 6437-38.

When asked about legitimate income, McArthur noted that he briefly held a job given to him by the tribe, but lost it when he violated his parole and was sent back to state prison. TT 6399. When McArthur was asked what he did with the proceeds from his drug sales, he testified that he bought clothes, jewelry, and traveled. TT 6437. McArthur also admitted that he used money from selling marijuana to purchase equipment to create a recording studio. TT 6475. Proof of McArthur's

Appellate Case: 17-2300    Page: 51    Date Filed: 09/29/2017 Entry ID: 4584463

recording studio can be seen in the government's trial evidence. Exh. 824; TT 5530-31.

The record before the District Court demonstrated that drug trafficking was McArthur's primary occupation during the racketeering and drug conspiracies alleged. The record also showed beyond a preponderance of the evidence that McArthur derived income from his racketeering activities that exceeded 2000 times the then-existing hourly minimum wage of $7.25 an hour.

Any alleged absence of detailed evidence identifying precisely how much money McArthur earned while participating in the racketeering and drug conspiracies is not fatal to the District Court's determination. *See United States v. Morris*, 791 F.3d 910 (8th Cir. 2015)(evidence that leader of drug conspiracy had no reported income, had sold large quantities of methamphetamine each week, and had made rent payments and several large purchases was sufficient to support the enhancement under Section 2D1.1(b)(15); *see also United States v. Hawkins*, 866 F.3d 344 (5th Cir. 2017)(sentencing court can infer from facts in the record that criminal conduct was defendant's primary occupation where defendant did not

48

hold a job outside of the conspiracy and was linked to substantial drug trafficking).

## IV.  UNLESS THE DISTRICT COURT CUMULATIVELY ERRED BY MORE THAN SIX OFFENSE LEVELS, ANY ERROR IS HARMLESS.

At the Category III criminal history applicable to McArthur, the advisory Guidelines range is life imprisonment unless the total offense level is 42 or below.  Here, the District Court found a total offense level of 49.  For McArthur to be subject to an advisory range less of than life imprisonment, the adjusted offense level would need to be reduced by seven (7) levels, to an offense level of 42, where the range decreases to 360 months to life imprisonment.

To reduce his advisory range by seven or more levels, McArthur would need to prevail on his claim as to drug quantity (he claims a six-level error) and at least one of the other two challenged enhancements (the stash house and the criminal livelihood enhancements added two levels each).  Otherwise, McArthur's advisory range would have

49

remained the same. Thus, absent cumulative error comprising seven or more offense levels, any guidelines error here was harmless.

When a defendant preserves a Guidelines challenge, this Court reviews for harmless error. *United States v. Martinez*, 821 F.3d 984, 988 (8th Cir. 2016). There may "be situations where an error in calculating the appropriate guidelines range is harmless and, therefore, does not require remand." *United States v. Mashek*, 406 F.3d 1012, 1017 (8th Cir. 2005). The United States Supreme Court has stated that "remand is required only if the sentence was 'imposed *as a result of* an incorrect application of the Guidelines.'" *Williams v. United States*, 503 U.S. 193, 202-03 (1992)(quoting Section 3742(f)(1)).

Absent error in offense level calculations of seven or more levels, error in calculating McArthur's advisory guidelines range is harmless. This Court's decision in *United States v. Sykes* is dispositive. In *Sykes*, the guidelines error alleged by the defendant would not have resulted in any change to the advisory range, which would have remained at 360 months' to life imprisonment even if defendant prevailed on his claims. *United States v. Sykes*, 854 F.3d 457, 462 (8th Cir. 2017). The Court concluded that "even if we accept the entirety of [the defendant's] arguments regarding

50

the drug-quantity calculation and concluded that the district court erred, such error did not substantially influence sentencing because the district court nonetheless arrived at the proper Guidelines range." *Id.* Absent a seven-level or greater offense level error in this matter, the district court would have arrived at the same range, and, like in *Sykes*, any error would be harmless.

## CONCLUSION

For all the foregoing reasons, the judgment of the District Court should be affirmed.

51

# CERTIFICATE OF COMPLIANCE

The undersigned attorney for the United States certifies this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32. The brief has 9,281 words, proportionally spaced. The brief was prepared using Microsoft Word 2010.

Dated: September 29, 2017       Respectfully submitted,

GREGORY G. BROOKER
Acting United States Attorney

*s/ Andrew R. Winter*

By: Andrew R. Winter
Assistant U.S. Attorney

Attorneys for Appellee